**UTAH POWER & LIGHT CO. v. PFOST, Commissioner of Law Enforcement of Idaho, et al.**

**No. 1621.**

District Court, D. Idaho, S. D. Aug. 20, 1931.

228

Hawley & Worthwine, of Boise, Idaho, Merrill & Merrill, of Pocatello, Idaho (Geo. R. Corey, of Salt Lake City, Utah, and John F. MacLane, of New York City, of counsel), for plaintiff.

Fred J. Babcock, Atty. Gen., and Sidman I. Barber and Maurice H. Greene, Asst. Attys. Gen., for defendants.

Before SAWTELLE, Circuit Judge, and WEBSTER and CAVANAH, District Judges.

CAVANAH, District Judge.

The Legislature of Idaho at an extraordinary session enacted an act (Laws 1931 [Ex. Sess.] c. 3) requiring those engaged in the generation and production of electricity and electrical energy in the state for barter, sale, or exchange to pay a license tax of one-half mill per kilowatt hour on such electricity, and directed that it be measured at the place of production by recording watt hour meters or other suitable instruments. The plaintiff, Utah Power & Light Company, engaged in

generating, transmitting, and distributing electrical power and energy as a public utility in the states of Idaho, Utah, and Wyoming, brings this suit challenging the constitutionality of the act on the grounds that it violates the equal protection, due process, and commerce clauses of the Constitution of the United States, and conflicts with and violates certain provisions of the Constitution of the state of Idaho, and applies for an interlocutory injunction restraining the enforcement of the act pending the decree on final hearing.

 Numerous reasons are asserted by the plaintiff as to why the act should fall as contravening the provisions of the federal and state Constitutions, and among which there is first presented the question as to whether or not the act violates the Fourteenth Amendment of the Constitution of the United States and section 13 of article 1 of the Idaho Constitution, which have similar inhibitions against taking property without due process of law, as it is urged that it denies the plaintiff equal protection of the law and renders its property liable to be taken without due process of law. The penalty prescribed in the act and the exceptions provided in section 5 thereof, plaintiff asserts, furnish the basis for this claim. Generally, it has been said that the courts have no interest in the policy of the state revenue laws so long as equal protection is not denied and property is not taken without due process of law and it is reasonable and not arbitrary. The Fourteenth Amendment "only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances." Kentucky Railroad Tax Cases, 115 U. S. 321, 6 S. Ct. 57, 63, 29 L. Ed. 414; Magoun v. Illinois Trust & Sav. Bank, 170 U. S. 283, 18 S. Ct. 594, 42 L. Ed. 1037; State v. Horn et al., 27 Idaho, 782, 152 P. 275; and this policy may be carried out in a revenue as well as a police measure. The constitutional provision was not intended to compel the state to adopt an iron rule of equal taxation, for it may exempt certain classes of property from taxation at all, so long as the Legislature proceeds within reasonable limits. The fact that the state, in adjusting its revenue laws, has exempted a certain class, does not deny the equal protection of the law, and this right to classify for taxation is granted to impose an occupation tax if equally applicable to all within the class. Hope Natural Gas Co. v. Hall et al., 274 U. S. 284, 47

S. Ct. 639, 71 L. Ed. 1049; Heisler v. Thomas Colliery Co. et al., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Armour Packing Co. v. Lacy, 200 U. S. 226, 26 S. Ct. 232, 50 L. Ed. 451; Citizens' Telephone Co. v. Fuller, 229 U. S. 322, 33 S. Ct. 833, 57 L. Ed. 1206; Clark v. Titusville, 184 U. S. 329, 22 S. Ct. 382, 46 L. Ed. 569; American Manufacturing Co. v. City of St. Louis, 250 U. S. 459, 39 S. Ct. 522, 63 L. Ed. 1084. But it is urged that, as section 5 of the act exempts all electrical energy used for pumping irrigation water for Idaho lands except where the water so pumped is sold or rented to such lands on condition that the exemption which accrues to the benefit of the consumer of such electricity and the full amount of such tax which would have been used from such production, if the exemption had not been made, should be granted annually for the year in which the exemptions are made on the power bill to the consumer by the producer of such electricity, the statute takes private property for private purposes in violation of the provisions of the state Constitution and not due process of law. A similar statute of the state exempting property used for irrigation pumping purposes from a general property tax of an electrical company was held by the Supreme Court of Idaho as not contravening the state Constitution, for the reason that it did not levy a tax, but created an exemption, and that the credit of the state was not thereby extended, as there was no obligation on the part of the state created by the state, and the fact that "the transfer of the ultimate benefit of the exemption to the consumer— does not change its character as an exemption statute or require us to hold that it grants a subsidy to private individuals in a manner forbidden by the Constitution." Williams v. Baldridge, 48 Idaho, 618, 284 P. 203, 206. Accepting then the decision of the State Supreme Court in interpreting its state Constitution as controlling, the federal court will not interfere in the matter of exemption from state taxation under the Fourteenth Amendment, as such matters of classification are of state policy to be determined by the state. Florida Central & Peninsular Railroad Co. v. Reynolds, 183 U. S. 471, 22 S. Ct. 176, 46 L. Ed. 283; Bell's Gap Railroad Co. v. Pennsylvania, 134 U. S. 232, 10 S. Ct. 533, 33 L. Ed. 892.

 The suggestion made that, because the tax is not reflected in present rates, the exemption reduces its charges to its consumers for electrical energy for pumping water for irrigation purposes, and thereby results in a

reduction of its rates, and would be the taking of property without due process of law, is without merit when we consider that under its powers of rate-making the Public Utilities Commission of the state takes into consideration all taxes paid and exemptions required to be allowed in fixing the rates to be charged, and, this being the case, there can be no confiscation of plaintiff's property, as this tax exemption would in effect be borne by all the consumers, thereby relieving plaintiff from paying it at all.

As to the penalty provided in the act, it is sufficient to say that it is not involved in the present suit, as there is no attempt to now enforce it. It is separate from the other provisions of the act, and the act contains a section that, if any provision of it be held unconstitutional for any reason, it shall not affect the validity of the act as a whole, or of any provision which is not specifically adjudged invalid, so therefore, in advance of an attempt to enforce the penalty, we need not pass upon its validity. Ohio Tax Cases, 232 U. S. 576, 34 S. Ct. 372, 58 L. Ed. 737; Grenada Lumber Co. v. State of Mississippi, 217 U. S. 433, 30 S. Ct. 535, 54 L. Ed. 826; Western Union Telegraph Co. v. City of Richmond, 224 U. S. 160, 32 S. Ct. 449, 56 L. Ed. 710; Louisville & Nashville Railroad v. Garrett et al., 231 U. S. 298, 34 S. Ct. 48, 58 L. Ed. 229.

Even if sections 5 and 11 of the act are unconstitutional, the court is not warranted in declaring the whole act void, unless all the provisions are connected in subject-matter and depend on each other, for it is settled that an exemption or the penalty clause in a statute may be invalid, yet the rest of the statute remains unaffected and could be carried out. Gillesby v. Board of Commissioners, 17 Idaho, 586, 107 P. 71; State v. Bird, 29 Idaho, 47, 156 P. 1140; Little Rock & Ft. Smith Ry. Co. v. Worthen, 120 U. S. 97, 7 S. Ct. 469, 30 L. Ed. 588.

Thus viewing the act, we have no doubt that, even if sections 5 and 11 are excluded, there will remain a workable statute whose provisions will not depend upon the sections excluded, and the act would be capable of enforcement.

The fact that the act failed of passage at the regular session of the Legislature without having contained in it the exemption provision, and was thereafter adopted with the exemption clause, would not justify the court in presuming that the Legislature would not have passed it without the exemption provision, for it does not appear that the act would have been passed at the regular session with the exemption provision, or that it ever came to a vote. It is evident that the primary purpose of the act was to require all engaged in the generation and production of electricity and electrical energy in the state to pay a tax, and that it operates alike upon all who are so engaged. The tax required to be paid is uniform throughout the state and equal upon the same class similarly situate, which removes from it the charge that it infringes upon the equality clause.

The charge that the act imposes a double license for the same purpose, in violation of section 5, art. 7 of the state Constitution, is not well founded when we come to consider the two statutes involved, for section 4782 of the Idaho Compiled Statutes requires the payment of an annual license tax upon the right to do business as a corporation in the state, and affects all corporations alike, while the tax imposed by the act here affects all who generate electrical energy, whether incorporated or not, and is an excise tax upon the right to engage in that particular business. The rights are not the same, as one relates to a tax upon the franchise of the corporation as a privilege for being a corporation in the state, and the other for the privilege of conducting the business contemplated by the charter of the corporation. It is not requiring the payment of a double tax. Home Ins. Co. v. New York State, 134 U. S. 594, 10 S. Ct. 593, 33 L. Ed. 1025; Gundling v. Chicago, 177 U. S. 183, 20 S. Ct. 633, 44 L. Ed. 725; Baldwin Tool Works v. Blue et al. (D. C.) 240 F. 202. Nor is the act subject to the objection that, if the tax is a property tax, it also violates the Constitution of the state, in that it does not provide for the levying of a tax according to valuation and uniform upon the same class of property, for the reason that the tax here is not one on property, as contemplated by the Constitution, but nothing more than an occupation tax, which is distinguishable from a property tax, and is not therefore governed by the constitutional provisions. Alaska Fish Salting & By-Products Co. v. Smith, 255 U. S. 44, 41 S. Ct. 219, 65 L. Ed. 489; Alaska Pacific Fisheries v. Alaska (C. C. A.) 236 F. 52; Spreckels Sugar-Refining Co. v. McClain, 192 U. S. 397, 24 S. Ct. 376, 48 L. Ed. 496; Ohio Tax Cases, supra; Northern Pacific Railway Co. v. Gifford, 25 Idaho, 196, 136 P. 1131.

Another question has arisen which we should notice. It is whether the extraor-

dinary session of the Legislature was called as required by section 9 of article 4 of the state Constitution, it being asserted that there did not exist an extraordinary occasion justifying its calling, and therefore the session was not constitutionally convened, and the passage of the act at that session was void. This provision of the Constitution provides that: "The governor may, on extraordinary occasions, convene the legislature by proclamation stating the purposes for which he has convened it; but when so convened it shall have no power to legislate on any subjects other than those specified in the proclamation. * * *" It vests in the Governor power and discretion to convene the Legislature on extraordinary occasions in session which the framers of the Constitution have intrusted to the chief executive officer of the state alone. It would be an unprecedented proceeding for the court to entertain a controversy wherein proof is offered to ascertain judicially whether an extraordinary occasion existed of sufficient gravity to authorize the Governor to convene the Legislature in extra session. The character of the legislation to be considered by the Legislature was by the Constitution left to the Governor, and a review of such discretionary act of the Governor should not be done by the courts. In re Legislative Adjournment, 18 R. I. 830, 27 A. 324, 22 L. R. A. 716; Farrelly v. Cole, 60 Kan. 356, 56 P. 492, 497, 44 L. R. A. 464; In re Veto Power-Special Session of General Assembly, 9 Colo. 642, 21 P. 477; Lasseter v. State, 67 Fla. 240, 64 So. 847; Simpson v. Hill, 128 Okl. 269, 263 P. 635, 643, 56 A. L. R. 706.

The further claim is that the act is so uncertain that it is incapable of enforcement and that its interpretation and enforcement depends on the arbitrary construction placed thereon by the commissioner of law enforcement, as it is pointed out that the terms of the act will require that all electricity produced by the company engaged in the generation for sale or exchange shall be subject to the tax at the place of production, without deduction for the use by the producer of electricity for its own purposes or the losses which occur in the transmission which makes it uncertain to ascertain by measurement at the point of production, and that a conflict appears in sections 2 and 8 thereof, as section 2 provides that, in case the tax is not paid when due, it shall bear interest at 10 per cent. per annum, and section 8 calls for a penalty for three times the amount of the unpaid tax. An analysis of the title and body of the act do not show any ambiguity as to the basis of the measurement of the tax, for the title says, "levying a license tax of one half mill per kilowatt hour on electricity and electrical energy generated, manufactured or produced in the State of Idaho for barter, sale or exchange," and section 1 provides that "every individual, firm, partnership, common law trust, corporation, association or other organization, now engaged or hereafter to engage in the generation, manufacture or production of electricity and electrical energy in the State of Idaho, either through water power or by any other means for barter, sale, or exchange, and hereinafter referred to as the 'producer', shall on or before the fifteenth day of each calendar month, beginning with the 15th day of July, 1931, render a statement to the Commissioner of Law Enforcement of the State of Idaho of all electricity and electrical energy generated, manufactured or produced by him or it in the State of Idaho, during the preceding calendar month and therewith pay a license tax of one-half (½) mill per kilowatt hour on all such electricity and electrical energy so generated, manufactured or produced, measured at the place of production. * * *" Since section 1 provides that those engaged in the generation of electricity "for barter; sale, or exchange * * * pay a license tax of one-half (½) mill per kilowatt hour on all such electricity," it seems clear that it refers to energy generated for "barter, sale, or exchange," the same as referred to in the title. Nor does there appear to be a conflict in sections 2 and 8, as section 2 requires the payment of interest from the date the tax becomes due, that is, from the date of the delinquent tax which shall draw interest, while section 8 provides that, for a violation of any of the provisions of the act or failure to pay the tax, the producer shall be liable, in addition to the interest, three times the amount of the unpaid tax. Section 8 only provides for an additional penalty to the payment of the interest, and that is a matter within the power of the Legislature to impose. A statute should not be held void for uncertainty if any sensible or practical interpretation can be given. Alaska Pacific Fisheries v. Alaska (9th C. C. A.) 236 F. 70, affirmed 242 U. S. 648, 37 S. Ct. 242, 61 L. Ed. 544, and the language in this act "for barter, sale, or exchange" of the electricity produced, and "pay a license tax of one-half (½) mill per kilowatt hour on all such electricity and electrical energy so generated, * * *" is definite in

232

its relation to the energy by which the tax is to be measured.

We are next to inquire whether the act runs counter to section 16, art. 3, of the state Constitution, as it is claimed that the title and the act contain two different subjects, namely, (a) the levying of a license tax for revenue purposes, and (b) the application of credits on the electric bills of certain consumers of electricity; and that the subject of the act is not expressed in the title, in that the title purports to levy "a license tax of one half mill per kilowatt hour on electricity and electrical energy generated, manufactured or produced in the State of Idaho for barter, sale or exchange," whereas the act purports to levy upon the producer of electric energy for barter, sale, or exchange a tax of one-half mill on all kilowatt hours generated, manufactured, or produced by him, and, further, in the title there is exempted from the tax "the electricity and electrical energy actually used for pumping water for irrigation purposes on lands in the State of Idaho," whereas the act provides "that the full amount of such license tax which would have been due from such producers of electricity" shall be so exempted. The provision of the Constitution applicable declares: "Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

The material parts of the title and the act are: "An Act levying a license tax * * * on electricity and electrical energy generated, manufactured or produced in the State of Idaho for barter, sale or exchange. * * *" Section 1 of the act provides: "* * * Each and every individual, firm, * * * engaged * * * in the generation, manufacture or production of electricity and electrical energy in the State of Idaho * * * for barter, sale, or exchange, * * * shall * * * pay a license tax of one-half (½) mill per kilowatt hour on all such electricity and electrical energy so generated, manufactured or produced, measured at the place of production," and further the title provides: "Exempting from such license tax the electricity and electrical energy actually used for pumping water for irrigation purposes on lands in the State of Idaho and providing that such exemptions shall accrue to the benefit of the consumer of such electricity and electrical energy." And section 5 provides: "All electricity and electrical energy used for pumping water for irrigation purposes to be used on lands in the State of Idaho is exempt from the provisions of this Act, except in cases where the water so pumped is sold or rented to such irrigated lands. Provided, the exemption here given shall accrue to the benefit of the consumer of such electricity or electrical energy."

 It will be observed that section 1 of the act requires the producer to pay the tax on electricity and electrical energy generated, and that the only producer who is required to pay the tax is one who generates for barter, sale or exchange, and not where the plaintiff would be generating for its own use, and the language thus quoted relating to the exemption in the title and act are identical. Both exempt only electrical energy used for a specified purpose.

 It is apparent that any one reading the title would be advised of the proposed legislation. It is clear and definite and sufficiently broad to cover the different provisions of the act, so we are unable to give to the title and the act the interpretation urged by plaintiff, for both cover energy generated for barter, sale, or exchange, and provide for the exemption, as the title is not limited to energy actually used, and the act to what is produced, for, as already said, both the title and act cover energy generated for barter, sale, or exchange and the payment of the tax thereon. We think it clear that the act only embraces one subject and matters properly connected therewith, as it relates to the same subject and is not foreign to the subject expressed in the title. The title refers to the energy taxed and to the exemption, the same as stated in the act. They both provide for a license tax of one-half mill per kilowatt hour on electricity generated, manufactured or produced for barter, sale or exchange, as well as an exemption of electricity used for pumping water for irrigation purposes. The exemption is germane to the provision for the tax, and may properly appear in the Act.

We find that the Supreme Court of Idaho in its interpretation of section 16 of article 3 of the Idaho Constitution has held that, if one can "reasonably gather the purpose and object of this act as found in the bill from its title," and "put a person * * * on notice of the contents of the act" (Turner v. Coffin, 9 Idaho, 338, 74 P. 962, 968), that

would be a compliance with the constitutional requirements.

In a recent decision of the Supreme Court of the state in the case of State v. Pasta, 44 Idaho, 671, 258 P. 1075, 1076, the court said: "The object of the title of an act is to give a general statement of the subject-matter contained therein, and the act must not be so construed as to extend its effect beyond the limits fixed in the title. The title, however, must of necessity be brief; and a general statement will be held to be sufficient to include all the provisions having a reasonable connection with the subject-matter mentioned in the title and which have a reasonable tendency to accomplish the purpose of the act."

And again the Supreme Court of the state has said: "'If the provisions of a statute all relate, directly or indirectly, to the same subject, have a natural connection, and are not foreign to the subject expressed in the title, it is permissible to unite them in the same act. * * * The objections should be grave, and the conflict between the constitution and statute palpable, before the judiciary should disregard a legislative enactment upon the sole ground that it embraces more than one subject.' * * * 'Provisions of an act may be numerous; but, however numerous, if they can be, by fair intendment, considered as falling within the subject-matter of legislation, or necessary as ends and means to the attainment of the subject, the act will not conflict with the constitution.' '* * * it was not intended to obstruct honest legislation, or to prevent the incorporation into a single act of the entire statutory law upon one general subject.'" Pioneer Irr. Dist. v. Bradley, 8 Idaho, 310, 68 P. 295, 297, 101 Am. St. Rep. 201.

The further charge made by the plaintiff that the commissioner will construe the act to impose a tax based on all electricity generated or produced within the state of Idaho, and not solely upon such electricity for barter, sale, or exchange and other charges as to the manner in which he will attempt to enforce the act, are not matters which will warrant the court in holding the act invalid, but are to be considered in a proper proceeding, questioning the manner of administering the act by the commissioner when enforcing it.

Finally we are thus brought to the consideration of the difficult problem as to whether, in the practical operation of plaintiff's electrical system, the generation of electricity is a continuous, inseparable transfer of energy, constituting an unbroken chain from the state of its origin to that of its destination, and interstate from beginning to end, which will determine the question as to whether the legislative act, when applied to plaintiff's operations, infringes on the commerce clause of the Constitution. Applicable to this issue of facts is the fundamental principle that, where the production, transportation, and delivery of the product is essentially local and not essentially national in character, and the local interest is paramount and its production largely classified as essentially local in its nature, the enforcement of an excise tax in such a transaction does not place a direct burden upon interstate commerce, and in reaching a conclusion in cases of this kind the question as to whether it actually burdens interstate commerce must be determined from the various circumstances. The essential test is whether the tax in fact burdens interstate commerce, even though it is laid upon a privilege which the state has power to tax, and is illustrated by those cases which hold that, where one is doing both local and interstate business, the state can nevertheless impose a license tax for doing local business in such amount or manner if it appears that the production of the product is essentially local and indispensable with the carrying on of the business, and that the local interest is paramount. Neither the character of the commodity nor the preparation of it, or the intention of the owner to transport it out of the state, puts it in interstate commerce, for the movement of the commodity for another state must have actually in good faith begun and be going on, and the character of the transportation depends upon all the circumstances looking to what the owner had done in preparation for the journey and in carrying it out. There is no doubt of the power of the state to impose a license tax upon electrical utility business within the state and to measure it by the standard of production within the state, and whether it would deprive one of constitutional rights depends upon its practical operation and effect.

The act here requires that the tax be computed according to the amount of electricity and electrical energy by kilowatt hours generated in the state and measured at the place of production, irrespective of whether it be delivered or sold within or without state. The point of time when an article ceases to be under power of the state and comes under the protection of the Constitution was considered by the Supreme Court in the case

of Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 477, 29 L. Ed. 715, where it is said: "There must be a point of time when they (goods) cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination." There is a distinction between production and commerce, as commerce succeeds production and is not a part of it. Production or manufacture is a transformation of raw material into a change of form for use, while the functions of commerce consist in the purchasing, selling, and exchanging of commodities and the transportation incidental thereto. Hammer v. Dagenhart et al., 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724.

When in dealing with this subject, Mr. Justice Day of the Supreme Court in the case of Pennsylvania Gas Co. v. Public Service Commission, 252 U. S. 23, 40 S. Ct. 279, 281, 64 L. Ed. 434, gives an interesting discussion of the permission granted to the state in dealing with subjects which have relation to interstate commerce, and asserts:

"In dealing with interstate commerce it is not in some instances regarded as an infringement upon the authority delegated to Congress, to permit the states to pass laws indirectly affecting such commerce, when needed to protect or regulate matters of local interest. Such laws are operative until Congress acts under its superior authority by regulating the subject-matter for itself. In varying forms this subject has frequently been before this court. The previous cases were fully reviewed and deductions made therefrom in the Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. The paramount authority of Congress over the regulation of interstate commerce was again asserted in those cases. It was nevertheless recognized that there existed in the states a permissible exercise of authority, which they might use until Congress had taken possession of the field of regulation. After stating the limitations upon state authority, of this subject, we said (page 402 of 230 U. S., 33 S. Ct. 741; 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18): 'But within these limitations there necessarily remains to the states, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which nevertheless, with the acquiescence of Congress, have been controlled by state Legislature from the foundation of the government because of the necessity that they should not remain unregulated and that their regulation should be adapted to varying local exigencies; hence, the absence of regulation by Congress in such matters has not imported that there should be no restriction but rather that the states should continue to supply the needed rules until Congress should decide to supersede them. * * *'

"The rates of gas companies transmitting gas in interstate commerce are not only not regulated by Congress, but the Interstate Commerce Act expressly withholds the subject from federal control. Chapter 309, § 7, 36 Stat. 539, 544 [49 USCA § 1, subds. 1–9].

"The thing which the state commission has undertaken to regulate, while part of an interstate transmission, is local in its nature, and pertains to the furnishing of natural gas to local consumers within the city of Jamestown in the state of New York. The pipes which reach the customers served are supplied with gas directly from the main of the company which brings it into the state, nevertheless the service rendered is essentially local, and the sale of gas is by the company to local consumers who are reached by the use of the streets of the city in which the pipes are laid, and through which the gas is conducted to factories and residences as it is required for use. The service is similar to that of a local plant furnishing gas to consumers in a city."

When we come to analyze the bill and the affidavits filed on the application for an interlocutory injunction from which we must look to determine whether there is a real dispute over material questions of fact, we find that there is alleged in the bill that the plaintiff owns and operates an interconnected electrical power system consisting of generating stations, transmission and distribution lines, and other electrical equipment located in the states of Idaho, Utah, and Wyoming, where-

by electrical energy is generated, transmitted, distributed, and delivered for sale and exchange to its customers in each of said states; that the principal use of the electricity generated by it is at points in the states of Utah and Wyoming, and its stations in Idaho were constructed solely for Utah and Wyoming service, and that its local customers in Idaho have been connected to said stations to gain the economy and convenience thereof; that there is a continuous electric and electro magnetic path between the windings in the generator and the windings in the consumer's motor; that the entire electric system is a devise for transmitting the force (as the falling water) to and applying it at the point where it is to be utilized, and the entire process is a continuous, inseparable transfer of energy from the water through the generators along the lines to the consumer's point of use in Utah and Wyoming; that the measurement of energy "upon which the tax sought to be imposed by the Act is based, is, and will be, a direct measure of the magnitude and duration of interstate commerce in electricity or electrical energy over said system, after said commerce has commenced and during the course thereof." The affidavits filed by the defendant take an opposite view to that contended for by the plaintiff as to how and at what point the production of electrical energy begins and is completed by plaintiff's system, or that the same is operated in interstate commerce, so it is obvious from the allegations of the bill and what is set forth in the affidavits there is presented to the court at this stage of the proceedings a real controversy over material questions of fact which cannot be satisfactorily determined upon the presentation of affidavits and yet must be determined by the court before the constitutional validity of the act can be determined. Ohio Oil Co. v. Conway, 279 U. S. 813, 49 S. Ct. 256, 73 L. Ed. 972; Love et al. v. Atchison, T. & S. F. Ry. Co. (C. C. A.) 185 F. 321.

In view of what has been said and of the absence of a law of the state of any remedy enforceable by the plaintiff if the tax be paid and afterwards held invalid by the final decree, the motions of the defendant to dismiss and strike are denied, and the application of the plaintiff for an interlocutory injunction is granted upon the plaintiff giving an adequate bond whereby, in the event the act in question is adjudged valid by the final decree, the plaintiff and its surety will pay such amounts to satisfy the tax fixed by the act with the interest as provided in the act.